IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Epic Games, Inc., a Maryland corporation, | No. |
| Plaintiff, | |
| v. | |
| Isaac Strock, an individual, | |
| Defendant. | |

## COMPLAINT

Plaintiff Epic Games, Inc. ("Epic" or "Plaintiff") brings the following complaint against Defendant Isaac Strock ("Strock" or "Defendant"):

### I.    NATURE OF CASE

1.    Founded in 1991, Epic is a leader in the interactive entertainment and 3D engine technology fields. Over the past thirty years, Epic has created some of the most highly acclaimed and commercially successful video games and immersive digital content and experiences.

2.    One of Epic's most famous successes is *Fortnite*, a vibrant ecosystem full of a variety of social entertainment experiences, with over 500 million registered players. *Fortnite* is a multiplayer online experience where people interact in an online world. *Fortnite* also includes thousands of creator-made games across genres, such as adventure, roleplay, survival, and more.

3.    In order to play *Fortnite*, each player creates an Epic Games account that tracks gameplay statistics over time and contains personal information of the account holder. Players can use the accounts to purchase in-game cosmetic items as well as a *Fortnite* "Battle Pass," through which players can unlock cosmetics as they "level up" their accounts by playing games, completing quests and challenges, and more. Players can also earn cosmetic items without

purchasing them either by participating in free events, spending virtual currency earned by progressing the Battle Pass, or by winning certain tournaments. Cosmetic items have a variety of effects, from changing the appearance of the player's character to allowing the character to do a specific dance, among other things.

4.     Players collect and take pride in their collections of items in their accounts that they have obtained or purchased, and those items cannot be transferred between accounts after they are obtained.

5.     In addition to unique in-game items, which are earned through effort and resources invested, players' accounts contain their personal information. Accordingly, Epic goes to great lengths to protect these accounts. This includes robust technical mechanisms (such as two-factor authentication for account access) and a dedicated player support team that *Fortnite* players can contact to ensure that if a player loses access to their account, such as when a password is forgotten or email account is compromised, that player is able to regain access.

6.     Strock is in the business of stealing access to other players' Epic Games accounts. He uses illicit means to discover the players' usernames and passwords and in some cases even the login credentials for the players' email address associated with the players' Epic Games account. He then sells access to these accounts to the highest bidders. Strock has sold access to hundreds of other players' Epic Games accounts, boasting online about thousands of dollars in profits. Strock obtains access to these accounts by using fraudulent tactics, such as impersonating the true account holder to defeat Epic's account control protections and trick Epic's player support team.

7.     Strock also profits by selling information about Epic Games accounts that belong to others—such as usernames and IP addresses that are unique to the accounts—so that they can

steal other players' Epic Games accounts.

8.      Through his website, Strock also offered to sell a guide that instructs others on how to deceive Epic's player support team in order to fraudulently gain access to other players' accounts.

9.      Strock's actions harm Epic and the *Fortnite* community.  Epic has spent substantial resources investigating and working to prevent Strock's conduct.  Strock's conduct also directly harms *Fortnite* players who no longer have access to the accounts they spent time and money on.

10.     As a result of Strock's egregious conduct and resulting damage to Epic and its players, Epic brings this action seeking damages and injunctive relief against Strock for (i) fraud; (ii) tortious interference with Epic's *Fortnite* End User License Agreement (the "*Fortnite* EULA") with players whose accounts are stolen; (iii) breach of the *Fortnite* EULA and the Epic Terms of Service by Strock himself; (iv) copyright infringement in violation of the Copyright Act, 17 U.S.C. §§ 106 and 501, *et seq*.; (v) violation of the Illinois Deceptive Trade Practices Act, 815 ILCS 510/2, *et seq.*; and (vi) unjust enrichment.

## II.      JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of Epic's federal claims under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the Copyright Act, 17 U.S.C. §§ 106 and 501, *et seq.*  This Court has supplemental jurisdiction over Epic's related state law claims under 28 U.S.C. § 1367(a).

12.     This Court has personal jurisdiction over Strock because Strock is a citizen of Illinois and resides in Lee County in this District.

13.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and 1400(a) because (a) Defendant resides in the Northern District of Illinois, and/or (b) a substantial part of the events

giving rise to Epic's claims occurred in the Northern District of Illinois.

### III.    THE PARTIES

14.     Epic is a corporation duly organized and existing under the laws of the state of Maryland.  Epic has its principal place of business in Wake County, North Carolina.

15.     Isaac Strock is an individual who resides in Dixon, Illinois.

### IV.    FACTS APPLICABLE TO ALL CLAIMS

#### A.    Epic and *Fortnite*

16.     Founded in 1991, Epic is a Cary, North Carolina-based company and leader in the interactive entertainment and 3D engine technology fields.

17.     Epic operates *Fortnite*, a vibrant ecosystem full of a variety of social entertainment experiences, with over 500 million registered players.  *Fortnite* was released broadly on July 25, 2017.  *Fortnite* is a multi-player online experience where people interact in an online world. *Fortnite* is free to download; however, *Fortnite* sells in-game items such as outfits for characters.

18.     *Fortnite*'s extremely popular play-for-free "Battle Royale" game was released to the public on September 26, 2017.  *Fortnite*'s Battle Royale involves dropping a maximum of 100 players into a large map where the players battle each other until only one player (or team) remains standing.

19.     In order to play *Fortnite*, players must create an Epic Games account.  The account is solely for that player's personal use.  A player creates an account using their email address and provides a username and password to log into their account.

20.     In *Fortnite*, players can purchase in-game cosmetic items as well as a *Fortnite* "Battle Pass," through which players can unlock cosmetics as they "level up" their accounts by playing games, completing quests and challenges, and more.  Players can also earn cosmetic items without purchasing them either by participating in free events, spending virtual currency earned

by progressing the Battle Pass, or by winning certain tournaments.

21.     Cosmetic items have a variety of effects, from changing the appearance of the player's character to allowing the character to do a specific dance, among other things.  Some cosmetic items can only be obtained during special events or timeframes.  Once added to a player's locker, cosmetic items associated with a player's account cannot be traded or transferred to other players.

22.     Players' accounts may also store personal and payment information, as well as track gameplay statistics.  Players' accounts also contain any in-game digital currency purchased by the player (called "V-bucks"), which can be used to obtain a license to additional in-game content in *Fortnite*, among other things.

23.     Epic Games prohibits the buying and selling of Epic Games accounts and accordingly there is no legitimate market for Epic Games accounts.

24.     One reason Epic prohibits the sale or transfer of accounts is to protect the integrity of the accomplishments and content that *Fortnite* players obtain with their own accounts.  When a player purchases a *Fortnite* account from Strock, rather than creating and playing on their own account, that purchasing player gains access to in-game cosmetics and other items obtained by participation in special events or timeframes, or completing quests or challenges in *Fortnite* that the purchasing player did not earn themselves.  This account purchasing negates the accomplishments for other players who obtained them legitimately, driving these legitimate players away from *Fortnite*.

25.     Another reason Epic prohibits selling accounts is for the security of *Fortnite*, including to prevent cheaters whose accounts have been banned from *Fortnite* from circumventing that ban by acquiring a new account.

**B.    Epic's Efforts to Protect Epic Games accounts**

26.    Epic takes the security of its players' accounts seriously.  Epic constantly develops, implements, and updates measures designed to protect the accounts of its players, while also ensuring that players can regain access to their account if they forget a password or if the account is otherwise compromised.  This important balance is achieved in part through a dedicated player support team, and use of security questions and other information that should be known only by the account holder.

27.    In order to play *Fortnite*, a player must agree to the *Fortnite* End User License Agreement (the "*Fortnite* EULA").  When players download *Fortnite*, the *Fortnite* EULA is displayed on-screen for the players to accept before they can play *Fortnite*.  This is true for accounts created on all devices and platforms.

28.    For the governing *Fortnite* EULA here, the player must affirmatively accept the agreement by checking a box that reads, "I have read and agree with the End User License Agreement." After clicking that box, the person accepting the agreement must confirm a second time by clicking an "Accept" button before playing.  If a player does not complete these steps, the player will not be able to play *Fortnite*.  A true and correct copy of the *Fortnite* EULA is attached as **Exhibit 1**.

29.    The *Fortnite* EULA grants a "personal, non-exclusive, non-transferable, non-sublicensable limited right and license to install and use" *Fortnite*, subject to several license conditions.

30.    Among other conditions, a *Fortnite* licensee may not:

(a)    "use it commercially or for a promotional purpose except as Epic expressly authorizes;"

(b)     "sell, rent, lease, license, distribute, or otherwise transfer it;"

(c)     "use it to infringe or violate the rights of any third party, including but not limited to any intellectual property, publicity, or privacy rights;"

(d)     "behave in a manner which is detrimental to the enjoyment of [*Fortnite*] by other users as intended by Epic, in Epic's sole judgment, including but not limited to… social engineering;" or

(e)     "transfer, sell, gift, exchange, trade, lease, sublicense, or rent Game Currency or Content except within the Software and as expressly permitted by Epic."

31.     Players may also acquire a license to in-game currency or content (for example, cosmetics).  When players earn or pay the fee to obtain the in-game currency or content, players "obtain[] or purchas[e] from Epic the right to have [their] License [to *Fortnite*] include such Game Currency or Content."  This in-game currency and content is subject to the terms of the *Fortnite* EULA and access can only be replaced, suspended, canceled, or eliminated by Epic.

32.     The *Fortnite* EULA terminates "automatically without notice if you fail to comply with any of its terms and conditions."  "Upon any termination, the License will automatically terminate, you may no longer exercise any of the rights granted to you by the License, and you must destroy all copies of [*Fortnite*] in your possession."

33.     In order to play *Fortnite*, a player must also agree to the Epic Games Terms of Service (the "Terms").  A true and correct copy of the Terms is attached as **Exhibit 2**.

34.     Among other conditions, the Terms state that players:

(a)     Are prohibited from "gifting or otherwise transferring…accounts;"

(b)     Are only "permitted to use the Services for your personal, non-commercial

use only or legitimate business purposes related to your role as a current or prospective customer of Epic;"

(c) "must not copy, modify, create derivative works of, publicly display, publicly perform, republish, or transmit any of the material obtained through the Services, or delete, or alter any copyright, trademark, or other proprietary rights notices from copies of materials from the Services;" and

(d) "must not reproduce, sell, or exploit for any commercial purposes any part of the Services, access to the Services or use of the Services or any services or materials available through the Services."

## C. Epic's Copyrights in *Fortnite*

35.    Epic is the author and owner of all rights and title to the copyrights in *Fortnite*, including, without limitation, in its computer software and audiovisual works.

36.    Epic's relevant copyrights in various versions of *Fortnite*'s computer code and audiovisual works are the subjects of U.S. Copyright Registrations listed in the table below.

| Title | Registration No. | Registration Date | Nature of Work |
|---|---|---|---|
| *Fortnite* | TX 8-766-571 | Jan. 31, 2019 | Revised computer program |
| *Fortnite* | TX 8-507-210 | Mar. 21, 2018 | Revised computer program |
| *Fortnite* | PA 2-066-544 | Sept. 13, 2017 | Revised computer program; audiovisual material |
| *Fortnite* | TX 8-186-254 | July 14, 2015 | Computer program |
| *Fortnite* | TX 8-254-659 | Mar. 3, 2016 | Computer program |
| *Fortnite* | TXu 1-895-864 | Dec. 18, 2013 | Computer program |
| *FORTNITE* (2016 Rev. 2) | TX 8-352-178 | Dec. 23, 2016 | Computer program |
| *Fortnite* – Battle Royale Mode | PA 2-087-919 | Mar. 23, 2018 | Revised and new audiovisual material |
| *Fortnite* Battle Royale Chapter 5 Season 1 | TX 9-420-173 | July 3, 2024 | Computer program; audiovisual material |
| *Fortnite* Chapter 4: Season | TX 9-388-536 | Apr. 25, 2024 | Computer program; |

| OG | | | audiovisual |
|---|---|---|---|
| *Fortnite* Reload | TX 9-437-406 | Sept. 17, 2024 | Computer program; audiovisual material |
| *Fortnite* (Rev. 3) | TX 8-508-464 | Sept. 8, 2017 | Computer program; audiovisual material |

True and correct copies of the certificates of registration for the above-listed copyrights are attached as **Exhibit 3**.

**D.     Strock's Unlawful Acts**

37.     Strock has downloaded and played *Fortnite*, accepting both the *Fortnite* EULA and the Terms on multiple occasions.

38.     Strock operates under aliases online, including "i5aac," and via multiple marketplaces through which he sells unauthorized access to other players' Epic Games accounts.

39.     Strock takes control of other players' Epic Games accounts through fraud.  Strock contacts Epic's player support team and pretends to be the account holder of the account he is trying to steal.  On information and belief, Strock provides sufficient information to deceive Epic's player support into providing him access to the account.

40.     Epic has caught Strock attempting to deceive its player support team at least four times: on December 21, 2022, June 16, 2023, and twice on June 18, 2023.  Each time, Strock contacted Epic player support attempting to take control of or change the email address associated with Epic Games accounts that did not belong to him.

41.     For example, on June 16, 2023, Strock contacted Epic's player support team and asked them if they could change the email on "my account," when he was actually referring to another player's Epic Games account.  He tried to deceive Epic's player support by providing information that only the true account holder ordinarily has, such as the username associated with the Epic Games account, any platforms that account is linked to (e.g., PC, Xbox, and PlayStation),

and the platform usernames associated with the account. Strock executed a similar scheme during each of the other instances referenced above.

42. On information and belief, Strock has successfully used schemes similar to the one described above to obtain access to players' Epic Games accounts through fraud.

43. Another method of gaining access to players' accounts is to find email address and password combinations for other, non-Epic-related accounts on the Internet (e.g., via dark web searches or data breaches), and attempt to log into Epic's services with those credentials.

44. Once Strock wrongfully gains access to another player's Epic Games account, he sells it through an online message board or "channel" on the Telegram platform at www.t.me/s/overdraft. The Epic Games accounts that have valuable *Fortnite* in-game currency and cosmetics command the highest price, often for hundreds or over one thousand dollars each. Strock has listed hundreds of accounts for sale through this channel.

45. The Epic Games account listings include details about the account, including the current purchase price, the amount of in-game *Fortnite* currency associated with the account, and screenshots of the notable or rare cosmetic items that the prior account holder had obtained on the account.

46. For example, on September 12, 2024, Strock posted the following listing for an Epic Games account with 146 skins and 30 V-Bucks on the t.me/overdraft channel, with a price of $350.



47.     Even though Strock did not create this account and was not the true account holder, Strock's home IP address was observed on that Epic Games account the same day the listing was posted, when he attempted to log into the account with the true account holder's credentials and initiated multi-factor authentication requests.  On information and belief, Strock was testing the credentials for the Epic Games account to confirm that they were correct before he listed the account for sale.

48.     On September 13, 2024, Strock sold the above-referenced account for approximately $425 worth of Bitcoin.

49.     After the payment, Strock sent an email and password that he illicitly acquired for the Epic Games account, and the password for the Outlook email account associated with the true account holder's Epic Games account.

50. Whenever Strock stole access to another player's Epic Games account and sold it, the rightful account holder lost access to their account and any in-game currency or content they had purchased or otherwise obtained in *Fortnite*.

51. As a result of Strock's deception of Epic, Strock interfered with the rightful account holder's license with Epic to the in-game currency and content associated with the account, effectively preventing the rightful account holder from accessing that licensed content.

52. In addition to selling accounts, Strock also operates a different Telegram channel at www.t.me/buttdial, where third parties can post Epic Games accounts for sale. He advertises that he sells special administrative privileges in the channel for $15.

53. Strock also operates a website at www.i5aac.com, which redirects to www.i5aac.mysellix.io. Strock's website states that it has been open since January 2024 and that he has sold 482 "products," which consist of other *Fortnite* players' Epic Games account information that his customers can use to deceive Epic in order to steal control of those accounts. These "products" include the email addresses, IP addresses, and/or geolocations associated with a particular Epic Games account.

54. Strock sells this account information for his buyers to use alongside any other information the buyer can gather, in order to deceive or "social engineer" Epic player support and get access to the underlying account.

55. Strock produced and offered for sale a guide that provided instructions on how to use social engineering tactics to trick Epic's player support team in order to fraudulently acquire Epic Games accounts that belong to other players.

56. Through his conduct, Strock has committed fraud, intentionally interfered with Epic's contracts with *Fortnite* players, breached his agreements with Epic, and infringed Epic's

copyrights.

57.    Strock breached the *Fortnite* EULA and the Terms by wrongfully accessing and selling access to other players' Epic Games accounts, including through fraudulent representations to Epic and its player support team.

58.    As a result of this breach, the *Fortnite* EULA between Epic and Strock automatically terminated and he was required to destroy all copies of *Fortnite* in his possession.

59.    Strock did not destroy his copies of *Fortnite*, and instead continues to download and access *Fortnite*, including through accounts to which he has stolen access.  Strock has therefore infringed Epic's copyrights by continuing to use unlicensed copies of *Fortnite* after his *Fortnite* EULA with Epic terminated.

60.    Strock has personally gained access to and has otherwise facilitated the sale of Epic Games accounts that do not belong to him, depriving the accounts' true holders of in-game currency, content, and other achievements in the accounts that they earned or purchased.

61.    Because he has accepted the *Fortnite* EULA and the Terms, Strock knows that these contracts include a license to the *Fortnite* in-game currency and content that the rightful account holder has obtained, and that by stealing the accounts he is interfering with that license.

62.    Strock further knows that his interference with Epic's contracts with these players is not justified.

63.    Strock's conduct has caused significant harm and loss to Epic and the *Fortnite* community.

64.    Epic has expended significant resources investigating and combatting Strock's fraud and account sales, including but not limited to developing guidelines and measures for its player support team to implement to avoid Strock's fraudulent schemes, and identifying and

investigating instances of Strock's account theft.

65.     Strock's wrongful conduct damages Epic's goodwill with the *Fortnite* community.

### COUNT I
### Fraud

66.     Epic realleges and incorporates fully by reference the allegations in Paragraphs 1 through 65 of this complaint, as if set forth fully herein.

67.     In order to steal access to Epic Games accounts that do not belong to him, Strock falsely represented to Epic's player support team that he was the account holder and by using log in credentials for accounts that do not belong to him, including at least on September 12, 2024.

68.     Strock made these representations knowing that they were false.

69.     Strock made these representations with the intent to induce Epic into providing Strock access to other players' accounts.

70.     Epic reasonably and justifiably relied on Strock's false statements because Strock presented Epic with information about the accounts that Epic would reasonably expect that only the true account holder would know.

71.     As a result of Epic's reliance on Strock's misrepresentations, Epic has suffered damage to its goodwill and lost resources, such as the monetary and personnel resources associated with investigating and redressing Strock's fraudulent activities, which Epic would not have been forced to expend but for Strock's misrepresentations.

72.     Epic is entitled to all remedies available at law or equity, including injunctive relief, compensatory damages and/or other equitable or monetary remedies.

### COUNT II
### Tortious Interference with a Contract

73.     Epic realleges and incorporates fully by reference the allegations in Paragraphs 1 through 72 of this complaint, as if set forth fully herein.

74.     In order to play *Fortnite*, a player must agree to the *Fortnite* EULA.  The *Fortnite* EULA grants a "personal, non-exclusive, non-transferable, non-sublicensable limited right and license to install and use" *Fortnite*, subject to several license conditions.

75.     Players may also acquire a license to in-game currency or content.  When players earn or pay the fee to obtain the in-game currency or content, players "obtain[] or purchas[e] from Epic the right to have their License [to *Fortnite*] include such Game Currency or Content."

76.     Strock knows that players must agree to the *Fortnite* EULA before downloading, playing, or otherwise accessing *Fortnite*.

77.     Strock has intentionally induced non-performance of the *Fortnite* EULA between Epic and the true account holders of the accounts that Strock stole access to by inducing Epic to grant Strock access to these Epic Games accounts and depriving the true account holders of their accounts and associated in-game content and currency, interfering with the true account holders' license to the content.

78.     Strock's interference was not justified.

79.     As a result of Strock's interference, the *Fortnite* EULA between Epic and the true account holders of the accounts that Strock stole access to was breached.

80.     Strock has intentionally interfered, and will continue to interfere, with the contracts formed between Epic and the true account holders of the accounts that Strock stole.

81.     As a result of Strock's actions, Epic has suffered damages in an amount to be proven at trial including, but not limited to, loss of goodwill among users of Epic's services, decreased profits, and the costs of investigating and redressing Strock's conduct.

82.     As a direct result of Strock's actions, Epic has sustained, and will continue to sustain, substantial, immediate, and irreparable harm for which there is no adequate remedy at law.

Epic is entitled to injunctive relief to restrain and enjoin Strock's continuing unlawful conduct.

83.     Epic is further entitled to compensatory damages and any other available relief the Court deems just.

### COUNT III
### Breach of Contract

84.     Epic realleges and incorporates fully by reference the allegations in paragraphs 1 through 83 of this complaint, as if set forth fully herein.

85.     In order to play *Fortnite*, a player must agree to the *Fortnite* EULA.  The *Fortnite* EULA grants a "personal, non-exclusive, non-transferable, non-sublicensable limited right and license to install and use" *Fortnite*, subject to several license conditions.

86.     Among other conditions, a *Fortnite* licensee may not:

(a)     "use it commercially or for a promotional purpose except as Epic expressly authorizes;"

(b)     "sell, rent, lease, license, distribute, or otherwise transfer it;"

(c)     "use it to infringe or violate the rights of any third party, including but not limited to any intellectual property, publicity, or privacy rights;"

(d)     "behave in a manner which is detrimental to the enjoyment of [*Fortnite*] by other users as intended by Epic, in Epic's sole judgment, including but not limited to… social engineering;" or

(e)     "transfer, sell, gift, exchange, trade, lease, sublicense, or rent Game Currency or Content except within the Software and as expressly permitted by Epic."

87.     In order to play *Fortnite*, a player must also agree to the Terms.  Among other conditions, the Terms state that players:

(a)     Are only "permitted to use the Services for your personal, non-commercial use only or legitimate business purposes related to your role as a current or prospective customer of Epic;"

(b)     "must not copy, modify, create derivative works of, publicly display, publicly perform, republish, or transmit any of the material obtained through the Services, or delete, or alter any copyright, trademark, or other proprietary rights notices from copies of materials from the Services;" and

(c)     "must not reproduce, sell, or exploit for any commercial purposes any part of the Services, access to the Services or use of the Services or any services or materials available through the Services."

88.     Strock accepted and agreed to the *Fortnite* EULA and Terms.  In exchange, Epic granted him access to *Fortnite*.

89.     The agreement between Strock and Epic is binding and valid.

90.     Through the conduct alleged herein, Strock breached his agreements with Epic by fraudulently accessing other players' accounts, and by buying and selling player accounts.

91.     As a result of Strock's actions, Epic has suffered damages in an amount to be proven at trial.

## COUNT IV
### Copyright Infringement
**(17 U.S.C. §§ 106, 501 *et seq.*)**

92.     Epic realleges and incorporates fully by reference the allegations in Paragraphs 1 through 91 of this complaint, as if set forth fully herein.

93.     Epic owns multiple valid, registered, and enforceable copyrights in *Fortnite*.

94.     These copyrights are depicted in the copyright registration certificates referenced

above and set out in Exhibit 1.

95.    In order to play *Fortnite*, a player must agree to the *Fortnite* EULA.  The *Fortnite* EULA grants a "personal, non-exclusive, non-transferable, non-sublicensable limited right and license to install and use" *Fortnite*, subject to several license conditions.

96.    The *Fortnite* EULA terminates "automatically without notice if you fail to comply with any of its terms and conditions."  "Upon any termination, the License will automatically terminate, you may no longer exercise any of the rights granted to you by the License, and you must destroy all copies of [*Fortnite*] in your possession."

97.    Strock breached the *Fortnite* EULA when he stole and sold Epic Games accounts.

98.    After breaching the *Fortnite* EULA, Strock's license to download, play, and otherwise access *Fortnite* automatically terminated.  Strock nonetheless continued to access *Fortnite* in violation of his agreement with Epic, and thus infringed Epic's copyrights.

99.    As a result of Strock's infringement, Epic has suffered damages, including lost sales and profits.

100.    Epic is also entitled to receive any additional profits made by Strock in connection with his infringement.

101.    Alternatively, Epic is entitled to statutory damages pursuant to 17 U.S.C. § 504(c).

## COUNT V
### Violation of the Illinois Deceptive Trade Practices Act
### (815 ILCS 510/2, *et seq.*)

102.    Epic realleges and incorporates fully by reference the allegations in paragraphs 1 through 101 of this complaint, as if set forth fully herein.

103.    Strock used deception, fraud, false pretense, false promise, misrepresentation, and/or the concealment, suppression, or omission of a material fact in order to take control of other

players' Epic Games accounts.

104.    Strock intended that Epic would rely on such deception or omission of material fact.

105.    Strock's deception of Epic occurred in the course of conduct involving trade or commerce.

106.    As a result of Strock's actions, Epic has sustained, and will continue to sustain, substantial, immediate, and irreparable harm for which there is no adequate remedy at law. Epic is entitled to injunctive relief to restrain and enjoin Strock's continuing unlawful conduct.

<u>COUNT VI</u><br><strong>Unjust Enrichment</strong>

107.    Epic realleges and incorporates fully by reference the allegations in paragraphs 1 through 106 of this complaint, as if set forth fully herein.

108.    As a result of Strock's fraudulent acquisition and subsequent sale of Epic Games accounts that did not belong to him, Strock unjustly retained benefits to Epic's detriment.

109.    Strock's retention of the benefits from his sale of stolen Epic Games accounts violates fundamental principles of justice, equity, and good conscience.

110.    Epic is entitled to all remedies available at law or equity, including injunctive relief, compensatory damages, and/or other equitable or monetary remedies.

<strong>V.    PRAYER FOR RELIEF</strong>

WHEREFORE, Plaintiff Epic Games, Inc. prays for the following relief:

A.    That judgment be entered in Epic's favor against Strock on all claims.

B.    That Strock and his officers, agents, representatives, servants, employees, heirs, successors, and assigns, and all others in active concert or participation with Strock be permanently enjoined from:

1)      Buying, selling, or fraudulently accessing Epic Games accounts;

2)      Inducing, contributing, or enabling others to buy, sell, or fraudulently access Epic Games accounts;

3)      Infringing, or inducing, contributing, or enabling others to infringe Epic's copyrights;

4)      Downloading, installing, possessing, and/or using any of Epic's copyrighted works, including but not limited to *Fortnite*; and

5)      Aiding or assisting another person or entity in any of the activities described in (1)-(4) above.

C.      An award to Epic of all damages permitted by law, including its costs incurred in this suit as well as reasonable attorneys' fees.

D.      Other such relief as the Court deems just and proper.

Dated:  February 27, 2025

By: */s/ Jeremy L. Buxbaum*

Jeremy L. Buxbaum (IL 6296010)
JBuxbaum@perkinscoie.com
PERKINS COIE LLP
110 North Wacker Drive, Suite 3400
Chicago, IL 60606
Telephone: 312.324.8400

Katherine M. Dugdale, (*pro hac vice* forthcoming)
KDugdale@perkinscoie.com
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, California 90067-1721
Telephone: +1.310.788.9900

Jacob P. Dini (*pro hac vice* forthcoming)
JDini@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Telephone: +1.206.359.8000